# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANTOINETTE WONSEY, | ) |
| Plaintiff, | ) |
| | ) No. 16 C 9936 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| THE CITY OF CHICAGO, a municipal corporation, SGT. VALENTIN, Star No. 2412, SGT. WILLIAMS, Star No. 1839, OFFICER GUTOWSKI, Star No. 15317, OFFICER TURNER, Star No. 18481, OFFICER CARIDINE, Star No. 13333, and unknown Chicago Police Officers, | ) |
| Defendants. | ) |

## OPINION AND ORDER

Plaintiff Antoinette Wonsey alleges that City of Chicago police officers, Sergeant Valentin, Sergeant Williams, Officer Turner, and Officer Caridine[1] (collectively, "Officer Defendants"), violated her Fourth Amendment rights when they unlawfully entered her home on two separate occasions and detained her in the process. Wonsey brings suit under 42 U.S.C. § 1983. The Officer Defendants and the City of Chicago (the "City") (collectively, "Defendants") move for summary judgment on all counts arguing that the undisputed facts establish that Defendants did not violate Wonsey's constitutional rights and that the Officer Defendants are entitled to qualified immunity. Because there is no genuine issue of material fact as to whether the Officer Defendants had consent to enter Wonsey's home in their first entry and no unlawful seizure occurred at that time, the Court grants summary judgment in Defendants' favor regarding those claims (Count I and part of Count III). Furthermore, the Officer Defendants are entitled to

---

[1] Although Officer Gutkowski is listed in the case caption, Wonsey has moved to dismiss him from the case with prejudice. *See* Doc. 65. The Court grants her motion, and so the Court does not address her claims against him in this Opinion.

qualified immunity regarding their second entry and potential unlawful seizure, and so the Court grants Defendants' motion for summary judgment regarding those claims as well (Count II and part of Count III). Finally, because Wonsey's claims against the City appear to be purely for indemnification purposes, and no remaining claims exist for which the City can indemnify the Officer Defendants, the Court grants summary judgment in favor of the City.

**BACKGROUND**[2]

In June 2016, Wonsey resided at 6439 S. Racine in Chicago (the "House"). Multiple other people also resided at the House. Wonsey rented the House to Airbnb guests as well as allowed individuals to store their luggage and wait at the House until other Airbnbs became available. The House has a front gate that requires a security code, which Wonsey provided to her friends, guests, and family members.

During the month of June in 2016, police officers from the City entered the House twice. The first time, on June 4, 2016, one of Wonsey's Airbnb guests reported to the police that someone had stolen his possessions. The guest, Leighcharles Fair-Smiley, reported that he was staying at the House through Airbnb. Valentin was on duty at this time, received the information about Fair-Smiley, and went to the House to conduct an investigation. Upon discovering the front gate locked, he attempted to ring the doorbell but received no response—Wonsey was asleep in the House when Valentin arrived. According to Wonsey, security tapes show Valentin attempting to open the gate by reaching his arm around and trying to open it from the inside. Valentin then called the station and received the code for the gate from Fair-Smiley. Valentin entered the code, rang the doorbell, and knocked on the door of the House. Two younger men

---

[2] The facts in this section are derived from the Joint Statement of Undisputed Material Facts [54] and the facts included in Wonsey's response to Defendants' motion for summary judgment [63]. The Court includes in this background section only those portions of the statements of fact that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. All facts are taken in the light most favorable to Wonsey, the non-movant.

answered the door, and Valentin identified himself and stated his purpose. The men allowed Valentin to enter the House. Valentin walked into the dining room and began talking to other residents in the House. Another officer, Frazier, arrived and entered the House to assist Valentin.

Wonsey then entered the dining room. Valentin explained his purpose to Wonsey and requested to see where Fair-Smiley was staying. Wonsey declined and asked the officers to leave. Wonsey walked the officers out of the House, and the three had a brief conversation at the front gate. The officers did not arrest Wonsey or tell her that she was not free to leave during this encounter.

The Chicago police returned a second time on June 9, 2016. The City's Department of Buildings received a request from the police department to inspect the House and sent a team of inspectors out to do so. The team included Marlene Hopkins, Keith Bialoruski, and Ramon Vargas. Caridine and Turner, as well as fellow officer Readus, accompanied the inspectors to the House. Another five police officers joined the team at the House. The team approached the front gate, only to find that it was locked. According to Wonsey, security footage again shows police officers trying to open the gate by reaching their arms around and attempting to open it from the inside. They then examined the exterior of the House while walking through an empty lot next to it. A man was sitting on the back porch of the House, and Vargas explained why the team was present and requested that the man open the back gate. The man, Rafat Bahar, opened the back gate for the inspectors and police officers, who then walked around to the front of the House. Wonsey met the inspectors at the front, and Hopkins explained the purpose of their visit. After a brief conversation, the inspectors understood that Wonsey allowed the inspectors to enter the House to conduct their inspection. A video reflects Wonsey gesturing her consent.

3

The inspectors then entered the House without the police officers. The inspectors recorded 32 violations of the Chicago Building Code. During the inspection, there were at least six occupants in the House in addition to Wonsey, and the report from the inspection cited Wonsey with having 12–18 occupants in the House. Because of the inspection, Hopkins ordered that the occupants evacuate due to the dangerous conditions of the House. The inspectors requested the police officers' assistance; at that point, Caridine and Turner entered the House. According to Wonsey, at least six officers entered the House during the inspection. According to Caridine and Turner, they only entered the common areas of the House. Turner and the three inspectors also stated in their affidavits that none of the police officers searched the House.

During the officers' second interaction with Wonsey regarding the House, no inspector or police officer placed her in handcuffs or told her she was not free to leave. However, according to Wonsey, the officers and inspectors surrounded her in her dining room during this time.

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a

bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

### I. Wonsey's Compliance with Local Rule 56.1

As an initial matter, Defendants seek to strike Wonsey's brief in opposition to their motion for summary judgment on the basis that it fails to comply with Northern District of Illinois Local Rule 56.1 and this Court's standing order. They argue that the brief fails to cite to the Joint Statement of Undisputed Material Facts ("JSUMF") or her additional statement of disputed facts. However, in reviewing the facts section of Wonsey's response brief, the Court found that she included multiple citations to both the JSUMF and her statement of disputed facts in that section of her brief. *See* Doc. 62 at 1–4. Accordingly, the Court denies Defendants' motion to strike Wonsey's response brief or disregard "citations or new assertions of fact" in Wonsey's brief. Doc. 66 at 2–3.

### II. Unlawful Search

Defendants argue that they are entitled to summary judgment on Wonsey's claims that the Officer Defendants conducted unlawful searches on June 4, 2016 and June 9, 2016 on the basis that (1) Wonsey did not have a reasonable expectation of privacy in the curtilage or common areas of her home (the two areas entered by police officers), (2) there is no dispute of fact as to whether the Officer Defendants had consent to enter, and (3) Wonsey has not shown a genuine issue of material fact as to whether the Officer Defendants acted reasonably in performing their duties (and thus are entitled to qualified immunity). Because the Court finds

that the issues of consent and qualified immunity dispose of the case, it does not reach the issue of reasonable expectation of privacy.

A.    Consent

"A warrantless entry into a private home constitutes a search and presumptively is unreasonable under the Fourth Amendment." *Leaf v. Shelnutt*, 400 F.3d 1070, 1081 (7th Cir. 2005). "A warrantless search is unreasonable under the Fourth Amendment unless (1) exigent circumstances and probable cause exist; or (2) consent is given." *Dakhlallah v. Zima*, 42 F. Supp. 3d 901, 913 (N.D. Ill. 2014) (citing *Reardon v. Wroan*, 811 F.2d 1025, 1027–28 (7th Cir. 1987)). "The probable cause and warrant requirements of the Fourth Amendment are not applicable where a party consents to a search, where a third party with common control over the searched premises consents, or where an individual with apparent authority to consent does so." *Id.* (citations omitted). Courts generally presume a warrantless search to be unreasonable. *Stubenfield v. Chicago Hous. Auth.*, 6 F. Supp. 3d 779, 784 (N.D. Ill. 2013) (citing *Valance v. Wisel*, 110 F.3d 1269, 1278 (7th Cir. 1997)). A defendant may rebut this presumption by presenting evidence that he obtained consent to perform the search; the burden then shifts back to the plaintiff to show either that consent did not occur or "that the consent was invalid because it was given under duress or coercion." *Valance*, 110 F.3d at 1279.

Regarding the June 4 entry, Defendants have presented evidence that Valentin received consent to enter the House. When Valentin encountered the locked gate, he called the station, which obtained the code for the gate from Fair-Smiley. And according to Valentin's affidavit, after he knocked on the front door and rang the doorbell, two young men answered the door. Doc. 54 ¶¶ 16, 17. Valentin identified himself and explained why he was there. *Id.* ¶ 17. The two men then allowed Valentin to enter the House. *Id.*

Upon this showing of consent, the burden then shifts back to Wonsey to show that Valentin did not actually obtain consent to enter the House or that the consent was invalid. Wonsey makes no argument that Valentin did not have consent to use the code that Fair-Smiley provided to open the gate and approach the House or that Fair-Smiley's provision of the gate code constituted inadequate consent. Thus, she has waived these arguments. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (holding that a party waives an argument if it is "underdeveloped, conclusory, or unsupported by law"); *TinleySparks, Inc. v. Vill. of Tinley Park*, 181 F. Supp. 3d 548, 561 (N.D. Ill. 2015) (same).

Wonsey does address whether Valentin had consent to enter the front door to the House. She notes that the video from her security camera on her front gate shows that "Valentin opened the front gate, walked up to the front door, rang the doorbell, knocked on the window or door, and entered in the property, all in approximately 19 seconds." Doc. 62 at 8. According to Wonsey, this timeline would not leave enough time for Valentin's version of events to be true: he would not have enough time to approach the House, knock and ring the doorbell, and, after the two young men answered the door, introduce himself, explain his purpose for being there, and obtain consent to enter. Review of the video itself shows that there was plenty of time for Valentin to introduce himself to the young men who answered the door and ask for consent to enter. Doc. 63-2. Even construing all facts and inferences in the light most favorable to Wonsey, this argument is too much of a reach to create a genuine issue of material fact as to consent. The timeline simply is not compressed enough to reasonably call Valentin's version of events into question, and Wonsey provides no other evidence on this issue. Wonsey asserts that Valentin's attempts to reach around the front gate and open in from the inside (before he obtained the code from Fair-Smiley) demonstrate Valentin's intention to violate Wonsey's

7

privacy rights. This argument is a red herring: Valentin's attempts to open the gate have nothing to do with whether he received consent to enter the House itself. Wonsey has not refuted Defendants' evidence that Valentin had consent to enter the House on June 4.

Wonsey also points out that Defendants did not provide further details regarding the identity of the two young men or the nature of their consent. This misunderstands Defendants' burden on this issue. Once Defendants provide evidence of consent, as they have done here through Valentin's affidavit, the burden returns to the plaintiff to establish either that the consent did not occur or that it was invalid. *Valance*, 110. F.3d at 1279. Wonsey could have deposed Valentin and questioned him further regarding this consent issue, or she could have deposed the other individuals present in the House at the time Valentin entered and shown that none of them provided consent to enter the House. She did not, however; her only attempt to cast doubt on Defendants' evidence of consent is the amount of time between Valentin entering the front gate and entering the front door of the House. As discussed above, this is insufficient to create a genuine issue of material fact regarding consent. She simply did not carry her burden on this issue.[3] Therefore, the Court grants the Officer Defendants' motion for summary judgment regarding Wonsey's unlawful search claim for June 4.

The June 9 entry is less straightforward. Both sides agree that Rafat Bahar allowed the officers[4] and inspectors to enter the curtilage of the House through the back gate and that Wonsey provided the inspectors consent to enter the House. Doc. 54 ¶ 37. According to

---

[3] Wonsey also points out that Defendants have not asserted that Frazier, the second officer to enter the House on June 4, had consent to enter the House. However, Wonsey has not brought a claim regarding Frazier's entry on June 4; he is not a defendant in this case, and so this argument does not help save Wonsey's illegal search claim regarding June 4.

[4] Both the June 4 and June 9 encounters involve police officers other than those involved in this case. In addition, both encounters do not involve all of the police officers involved in this case (although Wonsey does not specify which officers against whom she brings each claim). For these reasons, the Court does not refer to officers involved in each encounter as the Defendant Officers throughout this Opinion.

Defendants, those two facts constitute the provision of consent for the police officers to enter the House.  Regarding entry of the House itself, Defendants focus entirely on whether Wonsey provided consent to the inspectors, without explaining why this would also confer consent to the police officers' entry.  They do state that the "police officers received permission to enter the home from the inspectors," Doc. 66 at 7, but they do not explain why the inspectors would have the authority to consent to the police officers' presence in the home.

In response, Wonsey once again does not question that the officers had consent to enter the curtilage of the House, and so she waives the argument.  *Puffer*, 675 F.3d at 718.  Regarding entry to the House itself, however, Wonsey argues that the evidence does not clearly show that she or anyone else on the property that day consented.  Wonsey is correct.  Although the Defendants place great emphasis on the fact that Wonsey gave the inspectors permission to enter the House, they provide no support or authority to establish that the Court should interpret Wonsey's consent to the inspectors' entry as consent to the police officers' entry as well.  Defendants have not carried their burden of rebutting the presumption that the police officers' warrantless entry into the House on June 9 was unreasonable.

**B.     Qualified Immunity**

Defendants argue that they are entitled to qualified immunity regarding the events on June 4 and June 9. Because Valentin had consent to enter the House on June 4 and thus is not liable for an unlawful search, the Court only addresses the events on June 9.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, --- U.S. ----, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017) (citation omitted) (internal quotation marks omitted). "In other words, qualified immunity shields from liability [defendants] who act in ways they reasonably believe to be lawful." *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (internal quotation marks omitted). Once raised by the defendant, "a plaintiff must show (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time so that it would have been clear to a reasonable officer that her conduct was unlawful in the situation." *Id.*

The question here is whether the officers who entered the House on June 9 could have reasonably believed that their actions were constitutional. *See Hansen v. Cannon*, 122 F. App'x 265, 271 (7th Cir. 2004) ("The question is not whether [the officer] should have believed that his actions were reasonable, but whether he *could* have."). The Sixth Circuit encountered facts similar to those in this case in *Flatford v. City of Monroe*, 17 F.3d 162 (6th Cir. 1994). In *Flatford*, the Sixth Circuit held that the officers who evacuated a residential apartment building after inspectors determined that it "posed an immediate danger to its occupants and the public" were entitled to qualified immunity on the basis that they reasonably believed their entry into the building was justified by exigent circumstances. *Id.* at 169–71. The Sixth Circuit noted that "[t]he very point of the exigency exception under these circumstances is to allow immediate

10

effective action necessary to protect the safety of occupants, neighbors, and the public at large." *Id.* at 170. "Officers should, therefore, have wide latitude to rely on a building-safety official's expertise where that expert determination appears to have some basis in fact." *Id.* In the same vein, the inspectors whom the officers accompanied here recorded 32 violations of the Chicago Building Code. As a result of the inspection, the Managing Deputy Commissioner for the Department of Buildings (Hopkins) ordered that the officers assist in evacuating the home because of the building's dangerous conditions. Wonsey does not quarrel with this version of events or suggest that officers did not take the inspectors' findings seriously. Under the circumstances, a reasonable officer could have relied upon the inspectors' representations that the building served as a danger to its occupants and the public and believed that the officers' entry into the House to evacuate it was lawful. The officers maintain (and Wonsey does not provide facts contrary to this testimony) that they did not actually search the House upon entry and they merely entered the common space in the House to effectuate the evacuation order. Moreover, Wonsey presents no suspicious facts that would cause a reasonable officer to doubt the inspectors' decision that the House needed to be evacuated.[5] In light of these facts, the Officer Defendants are entitled to qualified immunity for their conduct on June 9.

## II. False Arrest/Unlawful Seizure Claim

Further, Defendants seek summary judgment as to Wonsey's claim of false arrest and unlawful seizure. Wonsey skips over this claim entirely in her response brief, effectively waiving any argument against summary judgment on this claim. *Puffer*, 675 F.3d at 718.

---

[5] Wonsey attempts to create a genuine issue of material fact by stating that there is an issue of fact as to whether Wonsey verbally threatened any of the inspectors inside the House. Doc. 62 at 10. Although verbal abuse of the inspectors could potentially add to the determination that the officers' conduct was reasonable, it is unnecessary to the Court's determination, which is based on Hopkins' decision that the House was unsafe for human occupancy, and thus not a material fact.

However, the burden remains on Defendants as the moving parties to establish that no genuine issue of material fact exists as to Wonsey's unlawful seizure claim. *Celotex*, 477 U.S. at 323.

"The 'crucial' test for determining if there has been a seizure is 'whether taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015) (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991)). "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Id.* (internal quotation marks omitted). Factors to consider include:

> whether the encounter occurred in a public or private place; whether the suspect was informed that he was not under arrest and free to leave; whether the suspect consented or refused to talk to the investigating officers; whether the investigating officers removed the suspect to another areas; whether there was physical touching, display of weapons, or other threatening conduct; and whether the suspect eventually departed the area without hindrance.

*United States v. Scheets*, 188 F.3d 829, 836–37 (7th Cir. 1999).

Turning to the facts at hand, it is clear that no seizure occurred during Wonsey's June 4 encounter. After a brief conversation with the officers, Wonsey asked both officers to leave and walked them out of her house. When asked to leave, the officers exited the House. Under those circumstances, with no additional facts to indicate that Wonsey did not feel free to go about her business, there is no genuine issue of material fact as to whether Valentin and Frazier seized Wonsey's person when they entered the House on June 4 and the Court grants summary judgment in the Officer Defendants' favor on this issue.

Regarding the June 9 entry, the Court has already found that the Officer Defendants are entitled to qualified immunity for their actions in that encounter. According to Wonsey's deposition testimony, that day, six officers entered her home and "surrounded her" in her dining room, telling her that she had to leave the House. Doc. 63 ¶ 29. The officers never told Wonsey that she was not free to leave or threatened to arrest her, but they also did not clarify that she was free to go about her business or that, if she ignored them, she would not be subject to arrest. The encounter occurred in a private place, at close quarters (especially considering that Wonsey and the six officers were not the only individuals in the dining room—the inspectors and a few other occupants were there as well). A factfinder could reasonably come to either of the two possible conclusions—that a seizure did or did not occur. However, even if a seizure did occur, as discussed above, the officers reasonably believed that their actions were constitutional in executing Hopkins' order to evacuate the House. The officers' actions were consistent with the intent to carry out that order—they were merely trying to convince Wonsey to leave. Thus, the Officer Defendants are entitled to qualified immunity regarding this claim for June 9.

### III. Claims Against the City

The only claim that Wonsey brings against the City is one for indemnification of the Officer Defendants as employees of the City. Because the Court finds that none of the City's employees are liable for the claims against it, the Court grants summary judgment in favor of the City on those claims as well. *Moore v. City of Chicago*, 209 F. Supp. 3d 1016, 1034 (N.D. Ill. 2016).

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment [52]. In addition, the Court grants Wonsey's motion to dismiss Defendant Gutowski [65]. The Court enters judgment for Defendants and terminates this case.

Dated: November 26, 2018

_____
SARA L. ELLIS
United States District Judge